UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> V. ) <br> ) <br> ) <br> DERRICK LAVON HERRING, ) <br> ) <br> Defendant. ) <br> ) | Crim. No. 6:14-cr-00008-GFVT-CJS <br><br> **OPINION** <br> **&** <br> **ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Mr. Derrick Herring's *pro se* Renewed Motion for Compassionate Release made pursuant to the First Step Act. [R. 189.] The United States opposes the motion, arguing that Mr. Herring has not established that a sentence reduction is warranted. [R. 182; R. 193.] For the reasons that follow, Mr. Herring's motion is **GRANTED**.

**I**

On July 16, 2014, Mr. Herring was found guilty by a jury of one count of conspiracy to distribute oxycodone. [R. 34.] On November 12, 2014, the Court sentenced Mr. Herring to 168-months imprisonment, followed by 4 years of supervised release. [R. 48.] As it stands, Mr. Herring has served roughly seventy-two months (six years) of his 168-month (fourteen years) sentence. [*See* R. 48.] The Bureau of Prisons, however, lists Mr. Herring's release date as January 1, 2026.[1] *See* Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/ inmateloc/ (last

---

[1] In the context of compassionate release, district courts routinely consider the length of a defendant's sentence that he-or-she has served at the time of the motion. Courts generally calculate the length of sentence served by reference to the BOP's "expected release date." Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/ inmateloc/ (last accessed Nov. 19, 2020). The BOP subtracts a defendant's good conduct time ("GCT") from his-or-her full sentence to determine an expected release date. *See* Bureau of

accessed Nov. 19, 2020). According to this Court's calculations, the time from Mr. Herring's sentencing to his projected release date equals, roughly, eleven years. Consequently, Mr. Herring, having served six years to-date, has served over half of his sentence.

On July 16, 2020, Mr. Herring filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), citing concerns with COVID-19 and his living conditions at FCI Loretto.[2] [R. 180 at 1–2.] In the alternative, Mr. Herring sought relief pursuant to The Coronavirus Aid, Relief, and Economic Security Act ("CARES" Act). *Id.* at 1. In support of his requests for relief, Mr. Herring represented that he has various health issues, including sleep apnea, tuberculosis ("TB"), obesity, and shortness of breath and that he desires to provide care to his children. *Id.* at 2. The United States opposed the motion, arguing it failed on substantive grounds. [*See* R. 182 at 6.]

---

Prisons, *Inmate Locator Information*, https://www.bop.gov /inmateloc/about_records.jsp (last accessed Nov. 19. 2020). Even so, the Court would like to emphasize the significance of GCT in regards to its effect on the average length of a federal prisoner's sentence and its persuasiveness in the context of compassionate release motions. 18 U.S.C. § 3624(b), as amended by the First Step Act of 2018 ("FSA"), grants certain federal prisoners "up to 54 days sentence credit for each year of the inmate's sentence imposed by the court." 18 U.S.C. § 3624(b). Additionally, the BOP considers "whether an inmate, during the relevant period, has earned, or is making satisfactory progress towards earning, a high school diploma or an equivalent degree." *Id.* In fact, the FSA's net effect on § 3624(b) has shown that "inmates on average now receive an additional seven days off for every year imposed, from 47 to 54 days." Jay Whetzel & Sarah Johnson, *To the Greatest Extent Practicable - Confronting the Implementation Challenges of the First Step Act*, 83 FED. PROBATION 3 (2019). As an example, an inmate with a seventeen-year sentence who consistently earns GCT could have their sentence reduced by over two-and-a-half years. *See* 18 U.S.C. § 3624(b). The record before the Court does not indicate that Mr. Herring has faced any discipline during his time in prison. However, Mr. Herring has shown, as his shortened expected release date reflects, that he has been an exemplary programming student in prison. [*See* R. 186.] While it is true that many courts, through the BOP's expected release date, do consider a prisoner's GCT *up-to* the date of their compassionate release motion, this Court believes that the average sentence length for an exemplary prisoner who consistently earns GCT, such as Mr. Herring, should be considered when calculating a prisoner's time-served.

[2] Both parties, in their briefings, indicate that Mr. Herring is being held at FCI Loretto. [R. 180 at 1–2; R. 182.] On November 9, 2020, Mr. Herring updated his current address to Hazelton FCI, located in Bruceton Mills, West Virginia. [R. 198]; *see* Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/ inmateloc/ (last accessed Nov. 19, 2020). Because Hazelton FCI has a similar number of coronavirus infections as FCI Loretto, the Court's analysis will remain unchanged. *See COVID-19 Cases*, Federal Bureau of Prisons, https://www. bop.gov/coronavirus/ (last visited Nov. 19, 2020).

2

On August 25, 2020, the Court denied Mr. Herring's Motion for Compassionate Release, without prejudice, because Mr. Herring had provided no documentation to support the claim that he had tuberculosis. [R. 185.] The United States represented that it had no record of this condition.[3] Mr. Herring has brought the present Renewed Motion for Compassionate Release. [R. 189.]

## II

As an initial matter, the Court notes the United States has concluded Mr. Herring has exhausted his administrative remedies under 18 U.S.C. § 3582(c)(1)(A), stating: "Because more than thirty days have lapsed since the Warden's receipt of Defendant's request, Defendant's motion is properly before this Court." [R. 182 at 6; *see* R. 185 at 2.] The Court questions this conclusion but is nonetheless bound by it for present purposes. *See United States v. Haas*, No. 6:17-CR-00037- GFVT-HAI-1, 2020 WL 4593206, at *4 (E.D. Ky. Aug. 7, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)). Effectively, the United States has waived any argument that Mr. Herring has failed to exhaust his administrative remedies and so the Court will address the substance of Mr. Herring's motion. *See Hamer v. Neighborhood Hous. Servs.*, 138 S. Ct. 13, 17 (2017) ("If properly invoked, mandatory claim-processing rules must be enforced, but they may be waived or forfeited."); *see also United States v. Alam*, 960 F.3d 831, 833–34 (6th Cir. 2020).

### A

Section 3582 allows for modification of a term of imprisonment for "extraordinary or compelling reasons." 18 U.S.C. § 3582(c)(1)(A). The statute also requires a court to consider

---

[3] The Court notes its skepticism as to the thoroughness of the United States' research into Mr. Herring's medical conditions. [*See* R. 182 at n.4.] ("The United States has obtained and reviewed Defendant's medical records from the BOP and found no record that Defendant has … tuberculosis"). A cursory search of Mr. Herring's medical records points to multiple references of latent tuberculosis. The United States acknowledged this condition only upon Mr. Herring's Renewed Motion, wherein he attached a condensed version of his medical records.

3

whether such a reduction comports with the 18 U.S.C. § 3553(a) factors and any applicable statements issued by the Sentencing Commission. *Id.* The U.S. Sentencing Guideline § 1B1.13 is now an inapplicable inquiry in cases where a prisoner files a motion for compassionate release. *United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *9 (Nov. 20, 2020).

The United States again argues Mr. Herring's motion fails on the merits for two reasons: (1) he has failed to establish "extraordinary and compelling reasons" that would warrant a reduction, and (2) because a reduction would be inconsistent with the factors set forth in 18 U.S.C. § 3553(a). Specifically, the United States points to Mr. Herring's medical records from his time in BOP custody, asserting that his medical conditions do not warrant compassionate release. [*Id.*] In a well-written reply, Mr. Herring disagreed with the Government's arguments. [R. 183.] Mr. Herring argued that the conditions at FCI Loretto "expose him to a substantial risk of contracting COVID-19" which will likely lead to a "dire outcome should he contract the virus." [*Id.* at 8.] In support of his argument, Mr. Herring now presents medical records showing (1) he tested positive for a "TB Skin Test" in January, 2015 [R. 189-1 at 2, 4–5]; (2) he has been diagnosed with latent tuberculosis ("latent TB") [*Id.*]; and (3) he has undergone treatment for his latent TB. [*Id.*] Further, Mr. Herring's medical reports reveal that he is obese,[4] has shown signs of sleep apnea [*Id.* at 8], and has received blood pressure readings that are far in excess of a healthy range.[5] [*Id.* at 10.] Mr. Herring believes (1) that his preexisting medical

---

[4] Herring stands 6'1'' tall [R. 53 at 9], and as recently as June 4, 2020, he weighed 273 pounds. [R. 189-1 at 7.] Plugging these figures into the CDC's Adult BMI Calculator, Mr. Herring's BMI is 36, which is one step removed from Class 3 obesity (categorized by the CDC as "extreme" or "severe" obesity). *Adult BMI Calculator*, Centers for Disease Control and Prevention (Sept. 17, 2020), https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html; *Defining Adult Overweight and Obesity*, Centers for Disease Control and Prevention (Sept. 17, 2020), https://www.cdc.gov/obesity/adult/defining.html.

[5] The Mayo Clinic indicates that either a systolic blood pressure reading of 130-139 mm Hg or a diastolic blood pressure reading of 80-90 mm Hg indicates Stage One high blood pressure (hypertension). *Blood pressure chart: what your readings mean*, MAYO CLINIC (Jan. 9, 2019), https://www.mayoclinic.org/

conditions present "extraordinary and compelling reasons" for release under 18 U.S.C. § 3582 (c)(1)(A)(i) [R. 183 at 2]; (2) he is not a danger to the public if released on home confinement. [*Id.* at 8–9]; and (3) the reduction of his sentence is consistent with the factors set forth in 18 U.S.C. § 3553(a). [*Id.* at 3.]

**B**

Mr. Herring has sufficiently demonstrated that his health conditions constitute "extraordinary or compelling circumstances" that warrant a sentence reduction. The Sentencing Commission has provided that "extraordinary and compelling reasons exist under any of" four circumstances. U.S. Sentencing Guidelines Manual § 1B1.13, cmt. n.1. However, given the Sixth Circuit's recent guidance in *Jones*, the Court "may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define "extraordinary and compelling" without consulting the policy statement § 1B1.13." No. 20-3701, 2020 WL 6817488, at *9 (Nov. 20, 2020). While Mr. Herring initially cited family circumstances that he believes justify compassionate release, he has not addressed any of the issues the Court noted in the previous denial. [*See* R. 185 at 5.] The Court will consider whether Mr. Herring's medical conditions warrant release.

**1**

Mr. Herring's has established, to this Court's satisfaction, that his medical conditions are serious enough to warrant release. Mr. Herring's initial motion for compassionate release was

---

diseases-conditions/high-blood-pressure/in-depth/blood-pressure/art-20050982. Further, either a systolic blood pressure reading of 140 mm Hg (or higher) or a diastolic blood pressure reading of 90 mm Hg (or higher) indicates Stage Two high blood pressure (hypertension). *Id.* Mr. Herring's medical records show that, at various times throughout his imprisonment, he has undergone blood pressure readings that meet the criteria for both Stage One and Stage Two high blood pressure. [*See* R. 189-1 at 10.]

dismissed, in part, because he failed to provide any documentation, and the United States represented it had found no record that Mr. Herring had the tuberculosis disease. [R. 182 at 7, n.4.] In his renewed Motion for Compassionate Release, Mr. Herring attaches his medical records, which reveal that Mr. Herring has been diagnosed and treated for latent TB. [R. 189; R. 189-1.]

The United States argues that Mr. Herring is not currently suffering from tuberculosis, as his "latent tuberculosis infection" had been fully treated by the medical providers in the BOP. [R. 195-4.] In fact, his medical records show that providers routinely screened him for signs of active tuberculosis, all of which came back negative. [R. 195-4.] As recently as December 3, 2019, Defendant had a chest x-ray that came back negative for signs of active tuberculosis and the BOP provider gave Mr. Herring tuberculosis "clearance." [*Id.*] The United States believes that these safety measures and results sufficiently mitigate Mr. Herring's "concerns" about contracting COVID-19. The medical community, in addition to many district courts around the country, disagree.

Mr. Herring argues that his medical conditions, including his diagnosis of latent tuberculosis, create serious medical conditions as defined by the Sentencing Commission policy statement. [*See* R. 180.] Mr. Herring believes that these conditions, in combination with the risks presented by the novel coronavirus disease, create circumstances that justify his early release. *Id.*

a

As a note, this Court is hesitant to consider information outside of the record. *See* ABA Standing Comm. on Ethics and Prof'l Responsibility, Formal Op. 478 (2017) (discussing the ethics of judges conducting independent fact-finding); *but cf.* Fed. R. Evid. 201(b) ("[t]he court may judicially notice a

6

fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Like many other sectors of society, district courts have been forced to adapt to the realities of the coronavirus and the accompanying influx of motions for compassionate release. Motions for compassionate release often require a consideration of COVID-19's comorbidity with other diseases. *See, e.g., United States v. Atwi*, 455 F.Supp.3d 426, 431 (E.D. Mich. Apr. 20, 2020). Medical research into COVID-19 has evolved at a tremendous pace and the medical community regularly makes new discoveries that impact courts' compassionate release analyses. As a result, many district courts have acknowledged our evolving understanding of the disease and have incorporated information, such as medical studies or newspaper reports, in order to inform their opinions. *See, e.g.*, *Atwi*, 455 F.Supp.3d at 431. Consequently, this Court will take judicial notice of relevant caselaw and well-known COVID-19 statistics; such findings are necessary to understand the medical conditions underlying this compassionate release motion.

The Court recognizes the severity of the novel coronavirus and its increasing risk in the United States. *See Coronavirus in the U.S.: Latest Map and Case Count*, https://www.ny times.com/interactive/2020/us/coronavirus-us-cases.html, N.Y. TIMES (last visited Nov. 6, 2020). This increasing trend is especially seen in Pennsylvania, where Mr. Herring is incarcerated. *See Pennsylvania Covid Map and Case Count*, https://www.nytimes.com/interactive/2020/us /pennsylvania-coronavirus-cases.html, N.Y. TIMES, (last visited Nov. 6, 2020). Pennsylvania is, and has been, outpacing the United States in both the relative number of new cases and deaths from the disease.[6] *Id.*

---

[6] The New York Times reports that, as of November 6, 2020, the fourteen-day change in cases for the U.S. is +54%, and +8% in deaths. The fourteen-day change in Pennsylvania in cases is +62%, and +10% in deaths. *See Pennsylvania Covid Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/ interactive/ 2020/us/pennsylvania-coronavirus-cases.html, (last visited Nov. 6, 2020).

There is no doubt that the dangers of coronavirus are exacerbated by the prison environment. *See, e.g., Atwi*, 455 F.Supp. 3d at 430. Among other issues that he has perceived at FCI Loretto, Mr. Herring cites overcrowded conditions and asserts that the prison staff members do not "wear their face masks as they are instructed to." [R. 180 at 2.] The United States seems to acknowledge Mr. Herring's issues with the living conditions at FCI Loretto, but does not cite to any information nor assert that FCI Loretto is providing sufficient protections for at-risk prisoners such as Mr. Herring. [*See* R. 182 at 6.] According to the Bureau of Prisons statistics, 56 of 846 inmates tested at FCI Loretto have tested positive for coronavirus. *See COVID-19 Cases*, Federal Bureau of Prisons, https://www. bop.gov/coronavirus/ (last visited Nov. 6, 2020). Mr. Herring asserts that, as of August 17, 2020, FCI Loretto has had confirmed COVID-19 cases in the facility. [R. 183 at 7.] The latest wave of positive tests within the facility seems to have come as recently as August 11, 2020. *See Officials confirm over 2 dozen FCI Loretto inmates positive for COVID-19, & some staff*, WJAC (NBC affiliate), https://wjactv.com/news/local/officials-confirm-over-2-dozen-fci-loretto-inmates-positive-for-covid-19-some-staff (last visited Nov. 6, 2020).

District courts have given FCI Loretto's efforts to curtail COVID-19 dissimilar treatment over the course of the pandemic. *Compare United States v. Amarrah*, 458 F.Supp.3d 611, 618 (E.D. Mich. May, 7, 2020) (noting that FCI Loretto had seemingly failed to implement many important CDC recommendations in its facility), *and United States v. King*, No. 6:16-cr-06043, 2020 WL 5098036, at *2 (W.D. N.Y. August 24, 2020) ("FCI Loretto has conducted extensive testing, and the number of inmates and staff currently suffering from the virus is small"). The BOP statistics show that the number of positive cases within FCI Loretto is currently low, however, the coronavirus is currently present within the facility and has been for months. *See*

*COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (Last visited Nov. 6, 2020). While the Court has no doubt that the dedicated professions within FCI Loretto are working hard to ensure the safety of its prisoners, the information before this Court, alone, does not assuage the Court's concerns regarding Mr. Herring's safety in light of his serious pre-existing conditions.

**b**

Mr. Herring has shown well-documented health conditions that present serious cause for concern in light of the COVID-19 pandemic. First, obesity (a BMI between 30 and 40) and severe obesity (BMI of 40 or above) have been shown to increase a person's risk of severe illness from the coronavirus. *People with Certain Medical Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people -with-medical-conditions.html (last visited Nov. 6, 2020). As previously discussed, Mr. Herring's BMI is 36, which puts him squarely at risk of severe illness if he were to catch COVID-19. *See* n.2. Many courts around the country have found moderate-to-severe obesity to be a persuasive factor in granting compassionate release. *See United States v. Delgado*, 457 F.Sup3d 85, 89–90 (D. Conn. Apr. 30, 2020) (finding that a defendant's severe obesity and sleep apnea put him at an increased risk in light of COVID-19); *see also United States v. Olawoye*, No. 1:15-cr-00172, 2020 WL 4559816, at *4 (D. Or. August 7, 2020) (citing the significant risk of obesity in defendant with BMI of 31.9); *Cf. United States v. Myers*, No. 18-20633, 2020 WL 4934343, at *3 (E.D. Mich. Aug. 24, 2020) (declining to release an otherwise healthy and relatively young inmate with obesity as only cognizable risk factor).

In April, doctors at NYU's Langone Health Center conducted one of the largest studies on the coronavirus at that point in time. *United States v. Delgado*, 457 F.Supp.3d 85, 89 (D.

9

Conn. 2020) (citing Tiernan Ray, *NYU Scientists—Largest US study of COVID-19 finds obesity the single biggest 'chronic' factor in New York City's hospitalizations*, ZDNet (Apr. 12, 2020), https://www.zdnet.com/article/nyu-scientists-largest-u-s-study-of-covid-19-finds-obesity-the-single-biggest-factor-in-new-york-critical-cases/).  The study, surveying over 4,103 people who had tested positive in New York City, found that "[t]he chronic condition with the strongest association with critical illness was obesity, with a substantially higher odds ration than any cardiovascular or pulmonary disease."  *Id.*  Further, an August 26, 2020 meta-analysis (pooling the results of seventy-five studies) showed that obesity significantly increased the odds of death among COVID-19 patients by a measure of forty-eight percent (48%).  *United States v. Morse*, No. 10-20361-cr, 2020 WL 6534899, at *3 (S.D. Fl. Nov. 3, 2020) (citing Barry M. Popkin et al., *Individuals with obesity and COVID-19: A global perspective on the epidemiology and biological relationships*, 21 OBESITY REVIEWS at 5 (2020))  Mr. Herring's obesity, at a BMI of 36, is not taken lightly by this Court.  The medical community has made it clear that obesity is a serious cause for concern, and it certainly weighs in this Court's analysis.

The record is also clear that Mr. Herring's blood pressure readings have proven to be far in excess of a healthy range.  *See* n.3.  The record does not reflect that Mr. Herring has ever been formally diagnosed with hypertension, nor does this Court have the expertise to do so now.  *Id.*  Mr. Herring's well-documented blood pressure readings, however, put him well within the Mayo Clinic's guidelines for both Stage One and Two high blood pressure and hypertension.  *Id.*  Further, it does not appear that Mr. Herring is, or ever has been treated for his abnormal high blood pressure readings.  [R. 189-1.]  Based upon what they know at this time, the CDC lists high blood pressure as a condition that "might" put individuals at an increased risk.  *People of*

10

*Any Age with Underlying Medical Conditions*, CDC.  However, preliminary research has suggested that:

> Patients with pre-existing damage to [blood] vessels, for example from diabetes and high blood pressure, face higher risk of serious disease … [r]ecent Centers for Disease Control and Prevention (CDC) data on hospitalized patients in 14 U.S. states found that about one-third had chronic lung disease–but nearly as many had diabetes, and fully half had pre-existing high blood pressure.

*United States v. Calloway*, No. 3:16-cr-00121, 2020 WL 3510684, at *2 (M.D. Tenn. June 29, 2020) (citing *[h]ow does coronavirus kill? Clinicians trace a ferocious rampage through the body, from brain to toes*, SCIENCE (April 17, 2020), https://www.sciencemag.org/news/2020/04/how-does-corona virus-kill-clinicians-trace-ferocious-rampage-through-body-brain-toes).  Notably, the risk is potentially more serious in this case, as "people with untreated high blood pressure seem to be more at risk of complications from COVID-19 than those whose high blood pressure is managed with medication." *Calloway*, 2020 WL 3510684, at *2 (citing Dr. William F. Marshall, III, *COVID-19 and high blood pressure: Am I at risk?*, MAYO CLINIC, (June 17, 2020), https://www.mayoclinic.org/diseases-conditions/corona virus/expert-answers/coronavirus-high-blood-pressure/faq-20487663).  Mr. Herring's elevated blood pressure levels, and the potential for complications from COVID-19, are also important factors in the Court's decision.

Mr. Herring has also been diagnosed with latent TB.  At this point in time, the implications of comorbidity for a patient with both COVID-19 and latent TB are unclear.  *See Doe v. Barr*, No. 20-cv-02141-LB, 2020 WL 1820667 at *5 (N.D. Cal. Apr. 12, 2020).  We do know that both diseases are respiratory and target the lungs.  *Id.*

11

The often-cited *Doe v. Barr* court noted:

> One observational study studied the relationship of tuberculosis and COVID-19 in 36 confirmed COVID-19 patients. It found that "individuals with latent or active TB [Tuberculosis] may be more susceptible to SARS-CoV-249 infection." It also found that "COVID-19 disease progression may be more rapid and severe" in those with latent or active tuberculosis. It identified "tuberculosis history (both of active TB and latent TB) [as] an important risk factor for SARS-CoV-2 infection." The study noted that its findings are limited because it is based on a low number of cases.

*Id.*; *Atwi*, 455 F.Supp.3d at 431; *United States v. Ireland*, No. 17-20203, 2020 WL 4050245, at *2–3 (E.D. Mich. July 20, 2020); *see also United States v. Burke*, No. 4:17-CR-3089, 2020 WL 3000330, at *2 (D. Neb. June 4, 2020) ("Research has yet to conclusively establish the risks associated with either latent tuberculosis or brain injury, but the known pulmonary comorbidities and symptoms of COVID-19 and increasing evidence of vascular complications make those conditions relevant as well"). In sum, medical experts have shared their concerns regarding the comorbidity of COVID-19 and latent TB from the outset of the pandemic.

While district courts around the country have given different weight to latent tuberculosis as an underlying condition, many have found it an extraordinary and compelling justification for compassionate release, especially when paired with other underlying conditions. *See, e.g., United States v. Parker*, No. 3:17-cr-18, 2020 WL 4432928, at *4 (D. Conn. July 31, 2020) (granting compassionate release where defendant suffered from latent TB, obesity, and elevated blood pressure); *Atwi*, 455 F.Supp.3d at 431 (granting compassionate release to prisoner whose only condition was latent TB); *United States v. Watkins*, No. 15-20333, 2020 WL 4016097, at *2–3 (E.D. Mich. July 16, 2020) (granting compassionate release to prisoner whose only underlying condition was previously-treated latent TB); *Singh v. Barr*, No. 20-CV-02346-VKD, 2020 WL 1929366, at *10 (N.D. Cal. Apr. 20, 2020) (granting release from immigration custody for petitioner with latent TB, hypertension, and obesity); *see also Thierry B. v. Decker*, No. CV

12

20-4035(MCA), 2020 WL 3074006, at *17 (D. N.J. June 10, 2020) (denying habeas relief but "acknowledg[ing] Petitioner's vulnerabilities to complications from COVID-19 in light of his latent TB, severe psoriasis, and anxiety"); *United States v. Johnson*, No. CR H-96-176, 2020 WL 3618682, at *3 (S.D. Tex. July 2, 2020) ("[latent TB] 'substantially diminishes' [an inmate's] ability 'to provide self-care'–remaining free of the most severe COVID-19 symptoms–'within the environment of a correctional facility' ").

It is true that other district courts have not considered latent TB a condition justifying compassionate release. *United States v. Rodriguez*, No. CR 17-618, 2020 WL 3447777, at *4 (E.D. Penn. June 24, 2020); *United States v. Sattar*, No. 02-CR-395, 2020 WL 3264163, at *3 (S.D.N.Y. June 17, 2020); *United States v. Clausen*, No. CR 00-29-2, 2020 WL 4260795 (E.D. Penn. July 24, 2020). "Given the scientific community's uncertain and evolving understanding of the interplay between COVID-19 and other pulmonary illnesses," however, this Court will follow the prudential decisions set out in *Doe*, *Parker*, *Atwi*, *Ireland*, *Johnson*, and *Watkins*, among others. *See Ireland*, 2020 WL 4050245, at *4 (E.D. Mich. July 20, 2020). Through his latent TB, obesity, and blood pressure, Mr. Herring has shown that his release is warranted under 18 U.S.C. § 3582(c)(1)(A)(i).

## 2

Even if Mr. Herring satisfies the extraordinary and compelling standard, release is warranted only if release complies with the factors set forth in 18 U.S.C. § 3553(a). The factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed--
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and

13

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for--
  (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--
    (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
    (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
  (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);
(5) any pertinent policy statement--
  (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
  (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  Each factor will be addressed in turn, though factors addressing issues that have already been discussed above will not be addressed again in exhaustive detail.

  *The nature and circumstances of the offense and the history and characteristics of the defendant* favor release.  In his initial Motion for Compassionate Release, Mr. Herring discussed the positive steps towards rehabilitation that he has undertaken.  Mr. Herring notes that he has taken "advantage of all the educational and vocational programming offered at each institution"

that he has been transferred to.[7] [R. 180 at 3.] Further, Mr. Herring asserts that he "score[s] minimum on the recidivism scoring" under the First Step Act. *Id.* Mr. Herring also points to a successful thirty-hour transfer furlough, from one prison to another, that was without incident. *Id.*; [*See* 183 at 1.] Defendant believes that he has demonstrated that he is not a danger to the community and shown his potential to turn his life around. *Id.*

In response, the Government believes that there is sufficient evidence to show Mr. Herring's danger to the community. [R. 182 at 10.] The government asserts, as fact, that Mr. Herring "brought a shotgun to steal money and pills from a dealer that Defendant was actually supplying." *Id.* The Government believes that the "use/presence of a firearm" exacerbates the underlying drug crime and reveals the danger of the Defendant. *Id.* Mr. Herring properly notes that the Government misconstrues the underlying facts on this point. [R. 183 at 1.] The Presentence Report ("PSR") outlines the facts pertinent to the offense Mr. Herring was charged with. [R. 53.] The PSR states that on November 18, 2013, police responded to the report of a home invasion. *Id.* The victim told police that "an *unknown person* armed with a shotgun" had taken money and drugs from him. *Id.* (emphasis added). While reviewing the victim's surveillance video, the victim "identified *various people* in the video as either users or sellers of narcotics." *Id.* (emphasis added). Mr. Herring was one person, of many, who was identified in that video. *Id.* Based on the information before the Court, the victim never accused Mr. Herring as being the individual with the shotgun, nor was Mr. Herring ever charged or convicted as such. *See Id.* The Government further points to Mr. Herring's four prior adult criminal convictions as evidence of his danger to society. [R. 53.] The Court agrees with the Government that Mr.

---

[7] Mr. Herring has also submitted a list of the roughly sixty completed educational programs that he undertook during his incarceration, including: calculus, Spanish language classes, and a parenting course. [R. 186-1.]

Herring's history of criminal convictions is concerning.  *See Id.*  However, Mr. Herring has never been convicted of a violent offense and was not convicted of armed home invasion in this case.  *See Id.*  Further, Mr. Herring's extensive programming efforts in prison show a commitment to change.

As an additional mechanism to prevent recidivism, once Mr. Herring has been released, Probation will monitor him for four years during the period of supervised release.  This period will provide the Court with the opportunity to monitor Mr. Herring's behavior through periodic drug and alcohol testing and searches of his residence, vehicle, or person.  [*See* R. 70 at 38–39.]  Therefore, given Mr. Herring's programming efforts in prison and the absence of violence in his criminal history, the Court is sufficiently persuaded that Mr. Herring will not be a danger to society or others upon release.

The gravity of Mr. Herring's crime is not in dispute.  The illegal distribution of opiates has undoubtedly taken a large toll on both eastern Kentucky and the United States as a whole.  However, as the record makes clear, the United States has not proven Mr. Herring to be a violent offender.  Mr. Herring has no convictions for violent crimes in his past.  [R. 54.]  It is true that Mr. Herring does have a criminal record with four previous convictions.[8]  However, these convictions were nonviolent and are relatively dated.  *Id.*  Further, Mr. Herring has undergone extensive programming while in prison.  These facts go to the history and characteristics of the defendant and support Mr. Herring's release.

---

[8] Mr. Herring's first conviction came at age 17, and his fourth conviction (preceding the present case) came at age 21.  [R. 54.]  Mr. Herring received probation on all of his convictions and violated the terms of his probation each time.  *Id.*  While these cases are relatively dated, the Court has seriously considered Mr. Herring's previous failures to conform his conduct to the terms of probation.  That being said, Mr. Herring initially received a significant period of supervised release at sentencing.  [R. 48.]  The Court believes that the imposition of supervised release in this case, following Mr. Herring's first term of incarceration, will be a sufficient deterrent for the Defendant.

*The need for the sentence imposed* cuts in favor of release. The sentence was necessary in this case to punish Mr. Herring for engaging in a drug crime. Mr. Herring has served nearly half of his sentence and has undergone extensive programming in prison. Given the unique danger COVID-19 poses for Mr. Herring, Mr. Herring's programming efforts, and the fact that he has served nearly half his sentence, the Court finds that this factor supports Mr. Herring's release.

*The kinds of sentences available and the established sentencing range* point in favor of release. Mr. Herring has served just over half of his sentence. Further, notwithstanding the length of Mr. Herring's sentence, compassionate release was designed to provide relief for individuals who no longer pose a threat to society and uniquely suffer from a serious medical condition. As discussed above, Mr. Herring fits those criteria and therefore merits release.

To the Court's understanding, while there are pertinent sections of the United States Sentencing Guidelines as discussed above, there are no pertinent provisions of United States Sentencing Guidelines that were designed as policy statements. Therefore, this factor is irrelevant to the Court's analysis.

*The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct* cuts in favor of Mr. Herring's release. It is important to note that the purpose of this factor is to avoid *unwarranted* sentence disparities, not any sentence disparities. Here, although Mr. Herring will only end up serving fifty-five percent of his sentence, Mr. Herring faces a unique risk of death from COVID-19, and therefore his release, given his unique circumstances discussed above, does not run afoul of this factor.

The need to provide restitution to any victims of the offense is not a relevant factor here. There were no direct victims of the crime for which Mr. Herring was convicted, and therefore this factor is irrelevant to the Court's analysis. [R. 48.] Ultimately, the Court is persuaded that Mr. Herring's release from custody would comply with the § 3553(a) factors.

As a note, Mr. Herring will be only thirty-four years old upon release. His exceptionally well-written pro se briefs underscore his intelligence and potential moving forward. Mr. Herring also noted the marketable skills he attained prior to his incarceration, including the installation of blinds and custom painting automobiles. The Court hopes that Mr. Herring will take this opportunity to become a productive member of society and to have a positive impact on the lives of his children.

### III

Here, Mr. Herring has exhausted his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A). Furthermore, Mr. Herring has provided an extraordinary and compelling reason for his release and has demonstrated that his release would comply with the § 3553(a) factors.

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Mr. Herring's Motion for Appointment of Counsel [**R. 191**] is **DENIED** as **MOOT**;

2. The Government's Motion for Extension of Time to File Response [**R. 192**] is **GRANTED**;

3. The Government's Motion for leave to Seal a Document [**R. 194**] is **GRANTED**, with the document [**R. 195**] to remain under seal;

4. Mr. Herring's Renewed Motion for Reconsideration of Appointment of Counsel [**R. 197**] is **DENIED** as **MOOT**;

5. Mr. Herring's Motion for Return of Personal Property [R. 163] will be addressed by subsequent order;

6. Mr. Herring's Renewed Motion for Compassionate Release [**R. 189**] is **GRANTED**.

7. Mr. Herring's sentence of incarceration is hereby **REDUCED** to **TIME SERVED**.

8. The Bureau of Prisons shall release Defendant immediately after holding him for a fourteen-day (14) quarantine period at his current Federal Correctional Institution;

9. Upon release, Mr. Herring shall be placed on **SUPERVISED RELEASE** for a term of **FOUR YEARS** pursuant to conditions previously imposed by the Court.

This the 24th day of November, 2020.

Gregory F. Van Tatenhove
United States District Judge